May it please the Court. I'm Christopher Meyer, appearing for appellant. With me is Xander Blewett. District Court abuses discretion when it allowed the defendant's ipsy-fixit expert testimony that the total load on the chain when it failed was over 35,200 pounds. The total load on the chain was the critical issue. As the Court had instructed the jury, if the chain did not conform to its design, then there was a manufacturing defect. Counsel, I have a couple of questions about that. My first one is on the expert testimony. It looked to me like both experts basically used a similar methodology. Neither one of them said there is a metallurgical defect or there isn't a metallurgical defect, but the links pull out at a certain stress. Neither one of them did destructive testing. Both of them basically inferred from the chain breaking how many pounds it must have taken to break it. Is that right? No, I don't think it is, Your Honor, with respect. Plaintiff's counsel determined to a reasonable degree of certainty that the load on the chain when it broke was between 15,000 and 20,000 pounds. And what was his methodology? His methodology was to look at the metallurgy of the chain and he was able to calculate the yield point, the point at which the chain would begin to permanently stretch when it was overloaded. And he determined that that was between 15,000 and 20,000 pounds. He also did destructive tests of chains just like the chain that failed in this case, 10 millimeter chains, in order to see whether when he pulled them to failure, at what point would they break and was there permanent stretching of the chain when they broke. Each of these experts ruled out causes and then came to the conclusion. In your case, your expert said this product is defective. That's the only conclusion that can be ruled. I ruled out all the other things. Their expert ruled out everything else except the dynamic load, which he said was what caused the breaking of the chain. And you're saying that the court should not have permitted that testimony. Why? I mean, that was their theory, which experts are permitted to express. It was their theory, Judge. We objected because their position that the chain had a load over 35,200 pounds depended on there being a dynamic load as well as a static load. Everyone agreed that the static load was approximately 16,460 pounds. Was it permissible for the expert, though, to say that, to describe the process of the dynamic load change? In other words, it seems to me that what you're challenging is just the final inference that the expert drew that it had to be a defect. We're challenging now, we're also challenging any suggestion as to the magnitude of the dynamic load. But he didn't testify as to the magnitude, did he? Yes, he did. He actually testified more than that. He said that the load on the chain when it broke exceeded 35,200 pounds. He said it was greater than that. But on what theory should the judge have excluded this testimony? I don't understand. District judges are often asked to exclude testimony. But this was a theory that this expert has put together. On what theory would you have excluded it? On the same basis by which the district court had, in its order in limine before trial, concluded that their expert did not have a reliable basis for his opinion as to a dynamic load. Because he had said he could not establish to a reasonable certainty what the dynamic load was. He testified in his deposition. He didn't know the center of gravity. He didn't know the rate of acceleration of the chain. He simply didn't have enough information to say this is the dynamic load to a reasonable degree of certainty. And the court, before trial, correctly said, well, then it's unreliable testimony. I thought at the trial what happened was testimony came out that there was a movement which would be sufficient to create a jerk. So it's kind of like when you're towing a car. If you take up the slack too fast, you can break the tow rope, even though the tow rope would be just fine if you didn't take up the slack too fast. There was an argument about whether there was a jerk. There was a dispute in the evidence about whether there was a jerk, as I recall. And once there's that dispute in the evidence about whether there's a jerk, it looks to me as though the foundation that was lacking in lemonade was now present. Well, Your Honor, there was foundation to say that there was a dynamic load on the chain, but not to say what its amount was. And that's why their expert on cross-examination at trial, he'd admitted, I can't establish to a reasonable degree of certainty what the dynamic load was. Well, did he admit that on the stand in front of the jury? Yes, in cross-examination. But he said it had to be in excess of 35,000 pounds. And that's what – yes, but – So whether it's 38 or 45, he's saying, I don't know. Your Honor, he said that he could not establish to a reasonable degree of certainty what the dynamic load was. He couldn't give a number to it at all. Why does he have to, as long as he says it's over 35,000 pounds, which is his only point and his only testimony? When he said it was over 35,000 pounds, it was pure ipsy-dixit. He didn't have a reliable basis for it. No, it wasn't ipsy-dixit. It was inference. He said the metal that they make this chain out of, the size of the links, unless you identify a metallurgical defect, it breaks at 35,000 pounds. There is no metallurgical defect. I looked for that. The load itself is less than 35,000 pounds. The only way to explain the break is that the dynamic stress on the chain was in excess of 35,000 pounds. You can infer that from the metallurgy and the size of the links and the nature of the load and the testimony about the drug. That's how I understood his process, his intellectual process to work. So it isn't just ipsy-dixit. It's logic. Why can't he do that? Because his testimony was different from that. What he said was the metallurgy by itself was not enough to form a conclusion that the load had to be over 35,200 pounds. Did your expert tell the jury that? Did he testify to that, your expert? Your expert did the same thing that the other party's expert did. He basically ruled out causes but came to the conclusion that it had to be a defect in the product. He based that, your honor, on the calculations that he did as to the load within which it failed without any permanent stretching of the chain. Their expert had no calculations. He had no methodology to establish. Well, didn't it become a question of fact for the jury to decide when those opposing viewpoints are put forth in front of the jury? Why should the judge be the one to decide that and take it away from the jury? Because, your honor, the judge had a duty to act as a gatekeeper here. And under Rule 702, the expert testimony that they offered was not reliable and should not have been admitted. And so the jury should never have even heard of it. I'm still not getting why. Ipsit-dixit means, in this context, because I say so. The chain broke because of a stress of over 35,000 just because I'm an expert and I say so. Not good enough. But since that's not what he testified, he gave a logical theory that made sense. It might be challengeable. It might be wrong. But it wasn't just because he said so. And that's not what the testimony was. So I don't really understand why you're— If I can go back to what I was saying before, your honor, he did not say that by the absence of metallurgical defects, that meant that the load had to be over 35,200 pounds. He testified that you had to go on and you had to look at what actually happened and to find out what the magnitude of the dynamic load was and to look at that. It wasn't enough for him. He didn't say, if I find nothing wrong with the metallurgy of this chain, then it must have been over 35,200 pounds. He said he had to go beyond that and to look at other circumstances to see what happened, what the facts of the case were. And that's why the dynamic load was critical to his opinion. Let me ask you about something else that's bothering me here. Basically, you've got a three-ton machine, a machine that's rated for three tons. It's being used to move an eight-ton piece of equipment, and it breaks. And the question is whether the machine is defective. To me, on the face of it, it isn't because it's a three-ton machine. And you're moving a load that's more than twice its rating. Your theory for defect, as far as I can tell, is that within the factory and within the Japanese system where they made this machine, they tested it out so that these machines were supposed to have a safety factor to where they wouldn't break even with eight tons. However, that was destructive testing. They break the chain, and it's only of a sampling of machines, not of all the machines. The idea is just the manufacturer is making it better than he has to to sell a three-ton machine so that you won't have any people coming back to him and saying, hey, I had a catastrophe at my work site. It's a three-ton machine broke lifting three tons. I don't get where you get a manufacturing defect out of a three-ton machine breaking with an eight-ton load. There's a manufacturing defect because the design requirement for the chain was that it have a minimum breaking strength of 35,200 pounds. The test to which Your Honor is referring was— It seems to me that if we accept that, what you mean by design, you mean the manufacturer saying, I want all my three-ton machines to have eight-ton chains just to make sure. If we adopt your standard, then the practical effect is that no manufacturer is ever going to build in a safety factor because he'll be penalized for building in a safety factor. If the manufacturer of the three-ton machine builds in a safety factor so it's safe with eight tons, then everybody can just use it for eight tons and when it breaks, sue the manufacturer because they didn't get an eight-ton machine. Judge, there is testimony by our expert that the reason why you have these high limits is that when you're actually using one of these chain pullers, you don't know what the load is. You do your best to estimate it at the beginning, but as you're making adjustments, the load is changing. It's necessary to have this high limit. You've got a dilemma with that argument. Either you have to accept the defense expert's theory that the dynamic load is much greater than the static load when you're moving something from a stop to a start or when the load jerks, in which case you're out of luck on your expert testimony admissibility argument, or you have to say the person can't tell the difference between three tons and eight tons, which is a real stretch. Three tons and four I can see, but three and eight? Well, Judge, at the end of trial, the district court took away the affirmative defense of unreasonable misuse and said that the use of the chain was reasonably foreseeable to defendants, and he based that on the fact that there were two different standards, two designs that applied to this chain. One was the minimum breaking strength of 35,200 pounds, and the other was a five-time the three-ton rated capacity, which is symmetric times roughly 33,000 pounds. So the court had determined at the end of the trial after hearing the evidence that there was no unreasonable misuse and recognized that those are the designs that apply in this case. Well, can you point to any evidence in this record that this product was defective other than your expert's opinion? Well, Your Honor, I can... Wasn't this a battle of opinion, basically, that each side had its own expert expressing an opinion? Was there any other evidence of defect? Well, yes, there was, Your Honor. I think there are two different issues here. One is whether there's a manufacturing defect. That turned on the question of whether the load was above or below either 33,000 pounds or 35,000 pounds. But there was also evidence that this chain had defects apart from that. What were they? Well, the first was that it broke at its weld instead of away from the weld. There was undisputed testimony that the normal behavior of a chain when it's overloaded is to break away from the weld. The weld is supposed to be the strongest part of the chain, and it broke at the weld. That's an immediate indication that there's something wrong with this weld. When plaintiff's expert destructively tested chains, 10-millimeter chains like this, they all broke away from the weld. Now, the second concerns the fact that these chains, all normal chains stretch permanently when they're overloaded, and this chain did not. And their own witness, Randy Anglum, said that when you look at a chain and it fails, you look to see whether it has stretched because that's an indication of overloading. The subject chain did not permanently stretch. In the test that plaintiff's expert did when he pulled them destructively, they all stretched permanently in a way that you could measure. And for that matter, their expert admitted on cross-examination that when he observed destructive testing of chains in Osaka, Japan, they all stretched in a way that was visually apparent and noticeable. So there was quite a foundation to say that this chain was defective apart from the fact that it clearly broke below 35,200 pounds, which the district court found when he granted our motion for a directed verdict to strike their affirmative defense of unreasonable misuse. He said the evidence shows that the load was clearly far below the limits. But the defense of unreasonable misuse contains other elements that may have been present to cause the court to grant a judgment on that. Is that true? With respect, Your Honor, the issue was— Tell me what the elements of unreasonable misuse are that have to be proved by a defendant. Under Montana law in the Lutz decision, it turns principally on whether the use was reasonably foreseeable to the defendant. If it wasn't reasonably foreseeable, it's unreasonable misuse. If it is reasonably foreseeable, it's not. What was the use involved in this case that you contended and the court agreed was reasonably foreseeable? What was the use? The use that was reasonably foreseeable was having a load of approximately 16,000 pounds, which was less than half of the design limits for this chain. Why is it reasonable to foresee that people will use a machine that says right on it, 3-ton limit, to lift 8 tons? Why is it reasonable? Why do you have to foresee, if your machine says right on it, that it's limited to a 3-ton load, that people are going to use it to lift 8 tons? Again, Your Honor, because of how when one uses this kind of a chain and you're adjusting, every time the chain length is adjusted, this was the testimony of our expert, the load changes. And this particular chain puller did not have a load gauge that would let its user know what the load was as he used it. Look, the difference between 3 tons and 8 tons, that's not the difference between a Ford Colt and a Ford Taurus. That's the difference between a Ford Taurus and a pickup truck full of rock. Yes, Your Honor. This chain puller was not being used by itself to hold this rock crusher. It was being used to adjust the angle, and there were other chains that were being used overhead to hold it. Its function was to adjust the angle of it so that it could go down. It was not being used to hoist it and to move it by itself. There were other chains that were there for that purpose, but they had to adjust the angle of the rock crusher, the pitman assembly, as they were lowering it. And every time you change the length of the chain, the load changes as well. And that's why there's the Japanese industrial standard that requires a minimum breaking strength of 35,200 pounds because it's known in the industry that you have to have a high limit. And they also had a safety factor of five times. That gets kind of obscure, though. I'm thinking my own example was Ford. It's not a pickup truck full of rock. It's a dump truck full of rock. And I'm thinking, if I see a dump truck full of rock, I know perfectly well that a 3-ton machine can't handle it. There was no dump truck full of rocks to see here because the chain puller was not being used to lift up this pitman assembly. His only purpose was to adjust its angle. It wasn't being used to lift, and that was the testimony. So you're saying there are multiple machines on it. Yes, yes. There were lots of photographs and trials showing how there was a massive overhead crane with the chains going down to hold it, and the chain puller, its purpose, again, was just to adjust the angle of this pitman assembly that was being lowered. The deceased here, the person who died, he was standing under this load? Your Honor, he wasn't standing under it. There were two guys who were lowering the pitman assembly into this rock crusher, and he went up next to them on a platform to inquire if they had installed a plate below the pitman assembly that was being lowered. And just at that point, that's when the chain puller's chain broke, and so the pitman assembly actually shifted and swung into him. I see I'm out of time. There are no more questions. Well, we'll give you a minute for rebuttal anyway. Thank you. Good morning. My name is Mike Johnson. I'm here today on behalf of American Power Pull. I'm not quite sure where you would like me to begin, so I'll just start on my own here. I think the first question that I will look at is one that presents some confusion to the other issues, and that is what was the design on this chain and chain puller? As the Court has noted, the puller itself had a 3-ton rated capacity. The chain in the puller had a 4-ton rated capacity. I'm sorry, I couldn't hear you. I said the chain in the puller had a 4-ton rated capacity. The Japanese industrial standard, which imposes testing on Japanese manufactured chains, states that every chain that is sold will have each link tested to twice its rated capacity, 8 tons, and that further, samples will be taken from every lot and destructively tested to four times the rated load, 16 tons. The plaintiff, or I should say Schlecht, consistently stated that this destructive test imposed an absolute requirement that every link from every chain from every lot never fail at a load less than four times its destructive load. I want to ask you what you believe is the significance of the Court granting judgment as a matter of law on the issue of unreasonable use by the defendant. That was one of your defenses. That is an issue that's very common. How does that impact disappeal? It really does not. I'll begin by saying that the Montana Supreme Court has been fairly liberal with the issue of unreasonable misuse. In this case, it really doesn't matter because the evidence that they are objecting to has to do with overloading, and that's the whole theory of this case. Their theory was that it was defective because it had a load that was less than what they claimed was the design standard. In other words, that it was not overloaded. More specifically, their claim is, as I take it, that there was a defective weld. The defective weld? Isn't that their theory? There was conflicting evidence from both experts as to what that meant. Mr. Powell, their expert, suggested that the weld break and some other metallurgical evidence suggested a defect. Well, EPP's expert, Mr. Moore, offered an opposite opinion based on his analysis. So the issue is... Well, I understand that they offered different opinions, but in terms of the plaintiff's theory was that that was where the defect lay. And your expert, Mr. Moore, said, no, there weren't any defects. I looked at it, and there weren't any defects at all, so there was conflicting evidence. But in terms of what they were attempting to show... As far as which issue? On the defectiveness of the chain itself. Well, I'm still not quite sure that I understand exactly what you're asking. The issue of the defect, the basic theory of the plaintiff's case, or Schlecht's case in this instance, was that the chain was defective because it failed at a load less than what they claimed was the design standard. And getting back to the first question about unreasonable misuse, that's all an issue of whether it was overloaded or not. In fact, if you look at the direct examination of plaintiff's expert, Mr. Powell, Schlecht's counsel, and he used the term overload no less than three times. I believe that was Excerpt of Record 87 through 89, when he was talking about an overloaded chain will stretch, while a chain that is not overloaded will not stretch. Of course, our expert offered opinion that the reason for no stretch in this case was that it was either defective or that it had suffered a high strain rate fracture as a result of a dynamic event. So again, you have two competing opinions. In any case... What was the rebuttal to the plaintiff's theory that an overloaded chain doesn't break at the weld? The weld is the strongest part. It breaks somewhere else. This chain broke at the weld, so it must have had a bad weld. Well, again, the testimony offered by the plaintiff's expert conflicted with that. Well, I just asked you what it was. Well, part of his explanation was that you cannot tell exactly how this particular dynamic event occurred. Did it break at the weld? It did break at the weld. And what was his explanation? They usually say a weld is the strongest part. Experts will say that, and I gather that's what the plaintiff's expert said here. My recollection of his explanation was that because of the way this chain puller was being used, it's wrapped around a pulley, it's got different angles on it, and nobody can tell exactly where that link was at the time that it broke. So nobody can tell exactly how the stresses were applied to that link. We don't know if it was strictly in a linear position, as it might be during a destructive test. We simply don't know. What we can tell is that, based on his metallurgical analysis of that link and of the chain and of the weld, that he could find no evidence of defect and no reason why it would not have withstood its design. Why isn't it evidence of a defect that it broke at the weld? Why isn't that evidence that it was a bad weld? What did the expert say? I mean, he must have been asked that. He was. And as I said, he looked at it and could find nothing wrong with the weld. Based on the metallurgy… He said that he looked at the weld and the weld looked okay to him? The weld looked okay. And as he also said, when you do not have a chain that's lined up in a linear fashion, it's hard to tell exactly how the forces are applied to those individual links. How can you tell that it was overloaded if a bunch of other devices, as well as the defendant's device, were being used simultaneously to lift and manage this load? Well, there was an estimate as to what the static load was on this machine. And not to go into too much of a digression on physics, but the main load was held by an upper crane. It was then adjusted by this chain puller. And as you begin to shallow the angle on the chain puller, the load becomes increasingly high at almost an exponential rate, and very quickly you have a pretty large load. We can understand some physics. Were a bunch of machines being used to move the load, or just this one machine? It's my understanding that there were two. There was an overhead crane and this chain puller that was used to adjust the angle because they did not have enough headroom to pull it out of the machine. Did either expert make a calculation of just what the load was, or did they both just draw inferences from the breakage? Which load? The original static load, or what they feel was the final load? Both. Both? Neither actually calculated the original load. What happened was employees for the company where this happened went back and tried to recreate it as best they could, and they put a strain gauge on the section where the chain puller would have been. So the static load of 16-some-thousand pounds is an estimate. Both experts accepted it because they couldn't go in and recreate it because nobody really knows. The dynamic loading is, during your discussion with opposing counsel, as far as total weight goes, what they think the final force was that broke this chain. Mr. Powell obviously based his opinion on what he found of lack of stretch, and he concluded that because it didn't stretch, it must have been below 20,000 pounds. APP's expert looked at the same chain, saw that there was no stretch, and said, well, if it breaks and it doesn't stretch, either there's a defect, or there was a high strain rate event caused by rapid deceleration, your dynamic event. He examined that chain link, found that there was no evidence of defect, found that there was metallurgical evidence of a high strain rate event, and contrary to what you've been told today, he did not admit that his metallurgical analysis was not sufficient to form those two opinions. What he said, and if you go back and look at the excerpts of record that are cited, I believe one is 204, the other one may be 729, and read his full statement. What he said was that his metallurgical analysis was very clear, but in order to remain objective, he reserved final judgment until he was able to look at witness statements, et cetera, to make sure that all the pieces fit. And I would submit that that gives him more credibility. Didn't he say on cross-examination, though, that he could not state the dynamic load at the time of the chain failure to a reasonable degree of certainty, engineering certainty? Yes, that's another point of confusion, I guess, in this case. Mr. Moore never said that he could precisely calculate what that final load was. He basically inferred by saying there's no defect, there was a dynamic situation, and it broke. Therefore, just logically, it had to be more than the minimum breaking amount. Yes, by the same, you're correct as well. It's basically the same type of opinion offered by plaintiffs' experts. He offered two primary opinions. One, I can find no defect, and therefore, there's no reason why this chain link would not have survived its design or the load, whatever that design might be. As I said before, there's some question as to what the actual design is. That's opinion one. Opinion two was, I have evidence of a high strain rate event. That accounts for the no stretching. There was also a lot of witness testimony that was suggestive that a high strain rate event might have occurred. Everybody knows that this chain moved. The plaintiff's own expert admitted that it could have been from a dynamic event. They admitted that this chain puller was acting unusually. The guys who had used it admitted that they'd used chain pullers that were overloaded before and that they acted jumpy and jittery and unusually. The man who tried to release the handle on this particular chain puller doesn't even remember what happened, but we know something pretty violent happened because he got hit in the head and his arm went numb. So those are the two opinions that were offered by Mr. Moore, APP's expert. And neither one of those are being challenged under the Daubert line of cases. In fact, they don't. Now, Schlecht doesn't really challenge the opinion on defect as far as the judges admitting it at all. They counted that it shouldn't have been taken seriously because they had opposing evidence, but the issue of whether it should have been presented to the jury is not an issue here today. As far as the opinion regarding high strain rate goes, as I've said, there's plenty of evidence regarding that, and the district court examined the same and concluded that there was plenty of evidence to offer the opinion that the break was the result of a high strain rate, rapid deceleration event. What was the plaintiff's expert's theory for why the chain must have broken at 16,000 pounds rather than 35? Well, I believe he never did calculate an amount either. He said it's in a range of between where we estimate the static load to be and between where he thought that the chain would begin to exhibit signs of stretching. That's all he said. He didn't calculate a load either. APP's expert... What was his theory? As to why it broke? Well, his theory was... He said the chain broke at around 15,000, 16,000 pounds. Yes. And the reason for that range... Is that what you're asking? Yes. The reason for that range was, one, the estimate that was done on the... where these people from the company went back afterwards with their strain gauge and tried to recreate the load. That was kind of the lower limit for his estimate, the 16,000. The upper range for his estimate was his finding that the chain hadn't stretched and that he concluded it would have started to stretch somewhere in the range of 20,000 pounds. He also admitted that he hadn't done any studies as to whether... The fact that it wasn't much higher than that was there would have been some chain stretch if it had been over 20,000 pounds. Yes. And in opposition, Mr. Moore stated that when you don't have stretch, it's one of two things. No defects or high strain rate. He found evidence of high strain rate. And the district court properly allowed that opinion. And neither one of those two opinions have been challenged under this Daubert ruling. The Ipsy-Dixon... Did he actually do any experiments to see if it did stretch at over 20,000 pounds? You know, he did some destructive testing. And I think there was some evidence that a chain pulled loose at around 20,000 pounds but did not exhibit stretching. I'd have to go back and look at the exact... What are the basis opinion that it stretched at 20,000 pounds, didn't stretch in this case, so it must have been... The plaintiff's expert? Lower. I'm not sure if... I don't think he can really tell. As far as my recollection goes... I'm asking about the record here because... Yes. As far as I recall, there's nothing in the record that states, I may be mistaken on this, precisely where this particular chain would have begun to exhibit signs of stretching. I believe that was an estimate on his part. But to address the Ipsy-Dixit question, I think you are correct in noting that opinions one and opinions two, no defect, no reason to see why it wouldn't have met its design, and two, evidence of high strain rate. The natural inference is that the high strain rate dynamic event increased the load beyond its minimum breaking load. So the question is whether that's an inference that the expert should be allowed to draw or whether that's an inference solely for the jury that doesn't itself require an expert to state the conclusion. Could you address that? That's what I understood them to mean in part by Ipsy-Dixit was that this was nothing expert about it. It was the same kind of an inference that a jury could draw and should be allowed to draw for themselves. Well, I don't believe that that's how the issue is framed in the appeal. And the other thing is... Could you address my question, though? Yes. You can argue that both ways. I think it is probably still an expert opinion. It's based on his other two opinions. And should that final inference have been left to the jury? Maybe it could have been. I don't think that it necessarily had to have been. Excuse me for one moment here. The other point that I'm going to try to get that one fully answered while I'm thinking about it, the plaintiffs have continually said that Mr. Moore stated that this load was over 35,000 pounds. That's not what he said. He said that there's no reason to believe it would not have withstood its design and that the dynamic load, more probably than not, increased the load above its design. He never did give an actual number on that. As I understood your argument about admission of the expert testimony, it was that, in substantial part, that the judge admitted plaintiff's expert testimony that was really not different in its methodology from the defendant's expert's methodology. He reasoned from the result to what must have been the cause. Since it broke at what he calculated to be 16,000 pounds, the cause must have been a defect. And the defense expert said, since it broke and there was nothing defective that I could find on close examination, the load must have exceeded 35,000 pounds. Have I got that right? More or less, yes. He said APP's expert did not say it was necessarily exceeding 35,000 pounds. He said that it probably exceeded the design. Not even the design, excuse me. He said that it probably exceeded the minimum breaking load, a test that is in the Japanese industrial standard. And one other point that I'd like to draw the attention of the court, and one that's addressed a couple of places in plaintiff's brief, or I should say the appellant's brief, has to do a little bit with the manufacturing process evidence and the issue of prejudice. They comment on the court's allowing Mr. Daikoku, who was a representative of the manufacturer, to state that none of these products had left the factory without satisfying the standard. The court allowed that statement to the extent, according to the district court, that it shows that all of these machines were subjected to the testing as required by the JIS, and by implication that that may mean that it had satisfied the standards. So it's clear that the judge was not, and the court was not simply stating that, as a matter of law, it had to satisfy this four-time standard. Unless there's no other questions, I think we're about done. Thank you. Thank you. Your Honor, briefly, there was a big difference in how the two experts analyzed this case. If ER excerpts of record 90 to 92 is where Mr. Powell, plaintiff's expert, talked about the calculations that he did to determine that the load was between 15,000 and 20,000 pounds, he did not simply take the PIC estimate that the Quipco workers had done. He calculated that it had to be between 15,000 and 20,000, at which point in that range that the chain would begin to stretch permanently. But then he went beyond that. He looked at, as I mentioned before, that the chain had broken away from the weld. He did his own destructive testing to ensure how normal chains behave. And this is very different from saying, oh, from defendant's experts, that he saw nothing wrong with the metallurgy of the chain, and therefore it has to be over 35,000 pounds, when he admitted that he couldn't establish, not just calculate, but establish what the dynamic load was. Well, the difficulty with this case is that you had the trial judge who had heard the entire trial, heard all of the evidence, had pre-trial motions. Based on his determination and his discretion at that time, he thought this defense should be presented, the same as your defense. You're now asking us to reverse that decision based on a substitution of our judgment for his. And I haven't seen in the record anything that would suggest that that should be done. With respect, Your Honor, when the court granted Plaintiff's motion, a motion for a directed verdict on a reasonable misuse, the court said, I find that the use was reasonably foreseeable because the load was well below the design limits in this case. And he said, now, there has been some testimony about a dynamic load, but that's not reliable and I'm not taking that into account. So at the very end of, at the close of the trial, the court itself recognized that this dynamic load testimony was not reliable, just as the court had done before the trial started. So you're basically saying that the granting of the motion for judgment on the unreasonable use defense takes care of the other one, too, and should preclude the presentation of any other defense. When the court, in a sense, yes. Do you view that as being an unreasonable use defense that was presented? They did present an unreasonable misuse defense. The answer to the judgment was granted against, in your favor on that. That was at the close of the trial. Yes, I know. When you say defense, I thought they just presented evidence of how it was used, but they were not allowed to get a jury instruction that it allowed the jury to deny liability, even if the product was defective, if it was misused. They were allowed to assert, to maintain their affirmative defense of unreasonable misuse throughout trial. Did they get an instruction? At the end of the, no, at the end of the trial, the court took away their unreasonable misuse defense. So you really were using the words a little differently from the way they're usually used. They were not allowed to present an unreasonable use defense. They were just allowed to get in evidence of how the product was used. That's correct, Your Honor. Aren't they entitled to show how they believe the accident happened? Yes. And that's what they did. Well, they showed how the accident happened, but they went beyond that, again, by offering their expert's testimony, which, as the judge had said, was when. Wasn't this jury told that the opinions expressed by these experts are not binding upon you, that you are free to reject them if you don't agree with them, that you consider their qualifications of the expert and the reasons given for his opinion, but you are not bound to accept it? The jury doesn't have to accept expert testimony. That's right, Your Honor. The jury doesn't. But Rule 702, Daubert, and Kumholm require that there be a reliable basis to expert testimony. And what he did really was to make an inference for which he had no reliable foundation. Our expert had very detailed calculations as well as testing. They did nothing of the kind. Thank you, counsel. Select versus American Powerful is submitted for decision. You're adjourned for the day.
judges: Kleinfeld, Graber, Rafeedie